**Michael BASS, Appellant,**

v.

**MUNICIPALITY OF ANCHORAGE, Appellee.**

**No. A–273.**

Court of Appeals of Alaska.

Dec. 14, 1984.

John T. Maltas, Asst. Public Defender, Kenai, Sen K. Tan, Asst. Public Defender, Anchorage, and Dana Fabe, Public Defender, Anchorage, for appellant.

Shelley K. Owens and James A. Crary, Asst. Municipal Prosecutors, Allen M. Bailey, Municipal Prosecutor, and Jerry Wertzbaugher, Municipal Atty., Anchorage, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

COATS, Judge.

Anchorage Police Officer Baker was dispatched to a single-car, injury accident in the area of Spenard Road at 3:00 a.m. on September 3, 1983. Baker saw Michael Bass being escorted back to the scene of the accident by an airport security officer. Bass's vehicle was overturned. Baker was told by a security officer that Bass had been in an accident, had fled the scene on foot, and had been pursued by the officer.

Baker asked Bass what happened and was told that Bass's vehicle went out of control and rolled when Bass swerved to avoid hitting another car. Baker observed the strong odor of alcohol, slurred speech and unsteadiness as Bass stood in the area. According to Baker, Bass was also extremely belligerent and noncooperative with paramedic rescue personnel at the scene of the accident.

Baker observed that Bass needed immediate medical attention. He noted that Bass had a hand injury which would require stitching and had hit his chest hard against the steering wheel. Bass was taken to Providence Hospital for treatment.

Baker arrived at the hospital emergency room at about 3:45 a.m. Upon arrival, he spoke to hospital personnel and learned that Bass had a lacerated hand which would require stitching and a severely bruised chest, with possibly some broken ribs. Baker was told that the hospital personnel did not anticipate knowing whether Bass would actually be admitted for at least two hours.

Baker then apparently called the municipal prosecutor, Allen Bailey, and explained that (1) because of the severity of Bass's injuries, Baker did not know when Bass's treatment would be completed; (2) even if Bass was not admitted, it would be several hours before a breathalyzer test could be done, and (3) based on what Baker was told about Bass's chest injuries, Baker was unsure whether Bass could blow into a breathalyzer sufficiently to give an accurate reading. Bailey advised Baker to obtain a blood sample.

When Baker informed Bass that blood would be drawn, Bass objected. He said that he was not going to have his blood drawn and started to walk out of the hospital. Baker then placed Bass under arrest, handcuffed him, and placed him back on the gurney. Officer Honnen assisted Baker in restraining Bass, putting Bass in a wristlock to assist Baker in handcuffing Bass. Honnen and Baker then restrained Bass, holding him onto the gurney while the laboratory technician drew blood from him. Baker admitted that there was some bleeding from Bass's lacerations at this time and that Baker was aware that Bass might have had cracked ribs, but that they restrained him as gently as they could.

Bass, on the other hand, indicated that the officers forced him down on the floor, dragged him over to the gurney, and inflicted so much pain that he could not move. He said he protested throughout the procedure. After the blood was drawn, Bass was issued a citation and the officers left him at the hospital. Bass's blood alcohol level was 0.243.

Both parties agree that Bass was conscious and alert at the time of the extraction of his blood. He actually walked into the hospital himself. He understood what was ·going on around him and verbalized his refusal to consent to the extraction.

On January 1, 1984, Bass moved to suppress the results of the blood-alcohol test. He based his motion upon the ground that he was not unconscious or otherwise in a condition rendering him incapable of refusing which would permit the nonconsensual extraction of his blood under AS 28.-35.035(b).

District Court Judge John D. Mason denied Bass's motion, making extensive factual findings. Judge Mason interpreted AS 28.35.035(b), which allows nonconsensual blood testing where a person is in a condition rendering him incapable of refusal, to include "a person being hospitalized as a result of incidents that have occurred" who "cannot fairly be offered a breathalyzer test." Judge Mason refused to suppress the results of the blood test. After a jury trial in which the results of his test were admitted into evidence, Bass was convicted of driving while intoxicated in violation of AMC 9.28.020. Bass now appeals to this court and argues that Judge Mason erred in not suppressing the results of the blood test. We reverse.

This case requires us to analyze the state statutes which authorize the police to initiate blood alcohol tests following an arrest for driving while intoxicated.[1] Under the state statutes, a person who drives a motor vehicle in the state implicitly consents to submit to a breath test to determine the amount of alcohol in his blood if he is lawfully arrested for driving while intoxicated. AS 28.35.031(a).[2] If one arrested for driving while intoxicated refuses to

---

1. Municipality of Anchorage ordinances also address this situation. They are virtually identical to the state statutes. Implied consent statute AS 28.35.031(a) is equivalent to AMC 9.28.021(A), which provides:

> A person who operates, drives or is in actual physical control of a motor vehicle within the municipality or who operates an aircraft as defined by AMC 9.28.020E.1 or who operates a watercraft as defined by AMC 9.28.020E.2 shall be considered to have given consent to a chemical test or tests of his or her breath for the purpose of determining the alcoholic content of his or her blood or breath if lawfully arrested for an offense arising out of acts alleged to have been committed while the person was operating, driving or in actual physical control of a motor vehicle or operating an aircraft or a watercraft while intoxicated. The test or tests shall be administered at the direction of a law enforcement officer who has reasonable ground to believe that the person was operating, driving, or in actual physical control of a motor vehicle or operating an aircraft or a watercraft in the municipality while intoxicated.

AS 28.35.032(a), "Refusal to submit to chemical test," is equivalent to AMC 9.28.022(A), which provides:

> If a person under arrest refuses the request of a law enforcement officer to submit to a chemical test under AMC 9.28.021A, after being advised by the officer that the refusal will, if that person was arrested while operating or driving a motor vehicle for which a driver's license is required, result in the denial or revocation of the license or nonresident privilege to drive, that the refusal may be used against the person in a civil or criminal action or proceeding arising out of an act alleged to have been committed by the person while operating or driving a motor vehicle or operating an aircraft or a watercraft while intoxicated, and that the refusal is a misdemeanor, a chemical test shall not be given, except as provided by AMC 9.28.025.

AS 28.35.035(a) and (b) have municipal code counterparts in AMC 9.28.025(A) and (B), which provide:

> A. If a person is under arrest for an offense arising out of acts alleged to have been committed while the person was driving a motor vehicle, and that arrest results from an accident that causes death or physical injury to another person, a chemical test may be administered without the consent of the person arrested to determine the amount of alcohol in that person's breath or blood.
>
> B. A person who is unconscious or otherwise in a condition rendering that person incapable of refusal is considered not to have withdrawn the consent provided under AMC 9.28.021A and AS 28.35.031(a), and a chemical test may be administered to determine the amount of alcohol in that person's breath or blood. A person who is unconscious or otherwise incapable of refusal need not be placed under arrest before a chemical test may be administered.

The motion and the arguments of both parties below, as well as the court's findings and ruling, referred to the state statutes. We thus refer to those statutes in this opinion. No party has suggested that the municipal ordinances would differ in application from the state statutes.

2. AS 28.35.031(a) provides:

> *Implied Consent.* (a) A person who operates or drives a motor vehicle in this state ... shall be considered to have given consent to a chemical test or tests of the person's breath for the purpose of determining the alcoholic content of the person's blood or breath if lawfully arrested for an offense arising out of acts alleged to have been committed while the person was operating or driving a motor vehicle ... while intoxicated. The test or tests shall be administered at the direction of a law enforcement officer who has reasonable grounds to believe that the person was operating or driving a motor vehicle ... in this state while intoxicated.

take a blood test, after being informed of the consequences of such refusal, "a chemical test shall not be given, except as provided by AS 28.35.035." AS 28.35.032.[3] AS 28.35.035 provides in part:

*Administration of chemical tests without consent.*

(a) If a person is under arrest for an offense arising out of acts alleged to have been committed while the person was driving a motor vehicle while intoxicated, and that arrest results from an accident that causes death or physical injury to another person, a chemical test may be administered without the consent of the person arrested to determine the amount of alcohol in that person's breath or blood.

(b) A person who is unconscious or otherwise in a condition rendering that person incapable of refusal is considered not to have withdrawn the consent provided under AS 28.35.031(a) and a chemical test may be administered to determine the amount of alcohol in that person's breath or blood. A person who is unconscious or otherwise incapable of refusal need not be placed under arrest before a chemical test may be administered.

In *Pena v. State*, 684 P.2d 864 (Alaska 1984), the supreme court held that "[t]he Implied Consent Statute provides the exclusive authority for the administration of police-initiated chemical sobriety tests to a driver arrested for acts allegedly committed while operating a motor vehicle."[4] *Id.* at 867 (footnote omitted). It therefore seems clear that the municipality can justify forcibly taking the blood sample from

Bass only if the taking falls under AS 28.35.035(b).

It seems clear to us that AS 28.35.035(b) does not apply to this case. In the implied consent statutes, the legislature has gone to great lengths to avoid authorizing the police to forcibly take blood alcohol tests from defendants charged with driving while intoxicated. The legislature has, instead, provided extremely strong incentives to a defendant to take a breath test for blood alcohol by providing criminal penalties. The legislature has provided for giving breath tests without the cooperation of the defendant only in two situations. In AS 28.35.035(a), the statute provides that if a person is under arrest for driving while intoxicated and the arrest results from an accident which caused death or physical injury to another person, a chemical test of the defendant's blood alcohol may be administered without consent. The policy behind this provision seems clear. If the driving while intoxicated offense is of the most serious type, involving death or physical injury, the legislature will allow taking a blood-alcohol test without consent.

The other situation in which the legislature has authorized taking a blood-alcohol test under AS 28.35.035 is where "a person . . . is unconscious or otherwise in a condition rendering that person incapable of refusal." The trial judge read this statute broadly. He found that Bass needed to be at the hospital for treatment and that the police could not give a breath test at the hospital. He also found that there was a possibility that, even if offered a breath test, the defendant would not physically be able to take it because of his injuries. He

---

**3.** AS 28.35.032(a) provides:

*Refusal to submit to chemical test.* (a) If a person under arrest refuses the request of a law enforcement officer to submit to a chemical test under AS 28.35.031(a), after being advised by the officer that the refusal will, if that person was arrested while operating or driving a motor vehicle for which a driver's license is required, result in the denial or revocation of the license or nonresident privilege to drive, that the refusal may be used against the person in a civil or criminal action

or proceeding arising out of an act alleged to have been committed by the person while operating or driving a motor vehicle or operating an aircraft or a watercraft while intoxicated, and that the refusal is a misdemeanor, a chemical test shall not be given, except as provided by AS 28.35.035.

**4.** The only exception to this principle would be consent to the blood-alcohol test. Consent is not an issue in this case.

concluded that Bass was "in a condition rendering [him] incapable of refusal."

 We believe that, in light of the fact that the legislature has gone to great lengths to not authorize the police to forcibly take blood tests, AS 28.35.035 should not be read broadly. Certainly it would have been easy for the legislature to say that the police could forcibly take a blood alcohol test if there were exigent circumstances which prevented the police from administering a breath test. The narrow language which the legislature chose precludes this interpretation. Therefore, the fact that it was not practical to offer Bass a breathalyzer test does not bring this case within AS 28.35.035(b). What does seem to fall within AS 28.35.035(b) is a narrow class of cases where the defendant is unconscious or otherwise incapable of manifesting his intent to refuse. In these cases the police would be able to take a blood test without the person's contemporaneous consent, but without having to use any violent means to obtain the blood-alcohol test. We note that the legislature did not say in AS 28.35.035(b) that the police could take a blood alcohol test *without consent* as it did in AS 28.35.035(a). Rather, the legislature said that "a person who is unconscious or *otherwise in a condition incapable of refusal* is considered *not to have withdrawn the consent provided under AS 28.35.031(a)*." (Emphasis supplied.) The legislature's choice of language seems to us to be consistent with the theory that AS 28.35.035(b) was intended to apply only to situations where a blood-alcohol test could be conducted without any violence such as where an arrestee is unconscious. A person who is unconscious is considered not to have withdrawn his implied consent and a blood-alcohol test can thus be administered under AS 28.35.035(b). This language does not seem to apply to a person in Bass's position, who definitely refused to consent to the blood test and resisted the test. Under these circumstances, we conclude that AS 28.35.035(b) did not authorize the police to initiate a blood-alcohol test, even if Bass was physically incapable of taking a breath test. We hold that Bass was not "a

person who [was] unconscious or otherwise in a condition incapable of refusal" for purposes of AS 28.35.035(b). Therefore, the police should not have forced Bass to have the blood sample drawn and Judge Mason should have suppressed the evidence.

 The municipality argues that the evidence against Bass at trial was strong, and that admission of the blood test result was, if error, harmless. We disagree. The blood alcohol test result of 0.243 was admitted at trial and could certainly have been critical evidence for this charge of driving while intoxicated.

The conviction is REVERSED.