**MUNICIPALITY OF ANCHORAGE,**
**Petitioner,**

v.

**Jeffrey L. RAY, Respondent.**

**No. A–4067.**

Court of Appeals of Alaska.

June 18, 1993.

---

Richard R. Felton, Asst. Mun. Prosecutor, and Richard L. McVeigh, Mun. Atty., Anchorage, for petitioner.

Frederick T. Slone, Kasmar & Slone, Anchorage, for respondent.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

## OPINION

MANNHEIMER, Judge.

On February 9, 1991, Jeffrey L. Ray was involved in a motor vehicle accident in which a pedestrian was injured. When the police arrived, they asked Ray if he would be willing to have his blood drawn and tested for alcohol content; Ray refused. The police then took Ray into custody,

transported him to a hospital, and had medical personnel draw a sample of his blood without his consent. When Ray's blood was tested, it was found to contain .133 percent alcohol, over the legal limit.

Ray was charged with driving while intoxicated under the Anchorage Municipal Code, § 9.28.020. In a pre-trial motion, Ray asked the district court to suppress the results of the blood test. Ray argued that the police were obligated to ask him to submit to a breath test first, and were empowered to draw his blood only if he refused the breath test. The district court agreed with Ray and suppressed the blood test results. We granted the Municipality's petition to review the district court's ruling. We now reverse the decision of the district court.

■ In deciding Ray's case, we will be interpreting a trio of state statutes: AS 28.35.031(a), AS 28.35.032(a), and AS 28.35.-035. At first blush, this may seem incongruous, since Ray was prosecuted under the Anchorage Municipal Code, not Title 28 of the Alaska statutes. The parties apparently litigated this case in district court on the basis of the state statutes; in fact, the appellate brief filed by the Municipality of Anchorage does not even mention the Anchorage Municipal Code. Ray's brief recognizes the distinction between state law and municipal law; nevertheless, he urges this court to treat the municipal ordinances as equivalent to the corresponding state statutes. We do so for two reasons. First, as Ray notes, the ordinances—AMC 9.28.-021, AMC 9.28.022(A), and AMC 9.28.025—are quite similar to the three state statutes, although there are some differences in wording. Second, state law prohibits municipalities from promulgating traffic laws that diverge from state law. AS 28.01.-010(a). Thus, we presume that the drafters of the municipal ordinances intended that the ordinances be interpreted in the same manner as the corresponding statutes.

### Construction of AS 28.35.035(a)

■ Alaska has enacted an "implied consent" law, AS 28.35.031(a), which declares that anyone who drives a motor vehicle in the state has impliedly consented to have the police administer a breath test to determine the motorist's blood alcohol content if the motorist has been lawfully arrested for an offense committed while the motorist was driving while intoxicated. However, the authority granted to the police by this statute is conditioned by a sibling statute, AS 28.35.032(a). In 1979, that statute read:

If a person under arrest refuses the request of a law enforcement officer to submit to a chemical test of his breath as provided in [AS 28.35.031(a)], ... a chemical test shall not be given.

(Quoted in *Anchorage v. Geber*, 592 P.2d 1187, 1190 (Alaska 1979)) In *Geber*, the Alaska Supreme Court held that if the arrested motorist refused to submit to a breath test, the police could not make the motorist submit to a blood test or any other chemical test. After exhaustively reviewing the legislative history of the 1979 versions of AS 28.35.031 and .032, the court concluded that the language "a chemical test shall not be given" was intended by the legislature to mean that no chemical test of any kind was to be given. *Id.* at 1191. Under *Geber*, if an arrested motorist declined to submit to the breath test mandated in section 031(a), that was the end of the matter.

Moreover, the *Geber* court interpreted AS 28.35.032(a) to bar the police from administering any chemical test other than a breath test, *regardless* of whether the motorist had affirmatively refused to take the breath test. The issue arose because one of the co-appellants in *Geber* had not refused to take a breath test until after the police had already drawn a blood sample from her. The court said:

Further comment is perhaps necessary concerning the taking of blood from [the appellant] Willis, since her refusal to take a [breath test] came *after* the blood sample was extracted from her body. In our view, the fact that she had not yet refused a breath test is of no significance. As we interpret the Implied Consent Statute [AS 28.35.031–032], it was intended to provide an exclusive method

for obtaining direct evidence of a suspect's blood alcohol content, absent his or her express consent to the use of some other form of testing.

*Geber*, 592 P.2d at 1192 (emphasis in the original).

Responding to the *Geber* decision, the legislature amended AS 28.35.032(a) and enacted AS 28.35.035. Section 032(a) now reads:

If a person under arrest refuses the request of a law enforcement officer to submit to a chemical test under ... AS 28.35.031(a), ... a chemical test may not be given, except as provided by AS 28.-35.035.

As 28.35.035(a) provides an exception for intoxicated drivers who have injured or killed someone else:

If a person is under arrest for an offense arising out of acts alleged to have been committed while the person was operating a motor vehicle ... while intoxicated, and that arrest results from an accident that causes death or physical injury to another person, a chemical test may be administered without the consent of the person arrested to determine the amount of alcohol in that person's breath or blood.

This brings us to the issue presented by Ray's case. The Municipality asserts that AS 28.35.035(a) authorizes the police to test an arrested motorist's blood whenever a motor vehicle accident has occurred and someone other than the motorist has been injured in the accident. According to the Municipality, the blood test can be conducted despite the motorist's protest and without regard to whether the motorist has refused a breath test. Ray, on the other hand, asserts that section 035(a) requires the police to first seek the motorist's consent to a breath test, and only if the motorist refuses to submit to a breath test can

the police conduct the more intrusive blood test.

Section 035(a) does not specify any requirement that an arrested motorist be offered a breath test first. Moreover, the concluding language of section 035(a) appears to support the Municipality's position: when an arrested motorist's drunk driving has caused injury or death, "a chemical test may be administered without the consent of the person arrested to determine the amount of alcohol in that person's breath or blood." However, Ray argues that these words should not be taken at face value.

Ray points out that in *Bass v. Anchorage*, 692 P.2d 961, 964–65 (Alaska App. 1984), this court recognized that one of the main policies behind Alaska's chemical testing statutes is to prevent physical confrontations between arrestees and police officers. Relying on this policy, this court gave a narrow construction to AS 28.35.-035(b), a sibling provision of the statute being litigated in this appeal.[1]

In *Bass*, the defendant motorist had been injured in the accident; he was conscious, but the police feared that his chest injuries would prevent him from performing a breath test. The police asked the defendant to consent to a blood test instead, but he refused. On appeal, the government argued that section 035(b) allowed a nonconsensual blood test whenever there was reason to believe that the motorist, because of injury, was physically incapable of accomplishing a breath test. This court rejected the government's construction of the statute, holding instead that the statutory language "incapable of refusal" meant "incapable of manifesting refusal":

[T]he fact that it was not practical to offer Bass a breathalyzer test does not bring this case within AS 28.35.035(b). [That statute addresses] a narrow class of cases where the defendant is uncon-

---

1. Section 035(b) deals with situations in which the arrested motorist is unconscious or otherwise incapable of affirmatively refusing to take a breath test:

A person who is unconscious or otherwise in a condition rendering that person incapable of refusal is considered not to have with-

drawn the consent provided under ... AS 28.35.031(a) and a chemical test may be administered to determine the amount of alcohol in that person's breath or blood. A person who is unconscious or otherwise incapable of refusal need not be placed under arrest for a chemical test to be administered.

scious or otherwise incapable of manifesting his intent to refuse. In these cases[,] the police would be able to take a blood test without the person's contemporaneous consent, but without having to use any violent means to obtain the blood-alcohol test.

*Bass*, 692 P.2d at 965. However, the court's next two sentences are not as favorable to Ray's position:

We note that the legislature did not say in AS 28.35.035(b) that the police could take a blood alcohol test *without consent as it did in AS 28.35.035(a)*. Rather, the legislature said that "a person who is unconscious or *otherwise in a condition incapable of refusal* is considered *not to have withdrawn the consent provided under AS 28.35.031(a)*.

*Id.* (original emphasis in italics; added emphasis underlined). This distinction between the language of sections 035(a) and 035(b) supports the Municipality's argument that the police are authorized to take a blood sample without regard to the motorist's consent, either to the blood test or to a breath test.

 Responding to the Municipality's argument that the language of AS 28.35.-035(a) does not specify that police are obliged to offer a breath test first, Ray correctly points out that Alaska has rejected a strict "plain meaning" approach to statutory construction; the fact that a statute's wording is apparently clear and unambiguous does not end the search for the legislature's intent. *Stephan v. State*, 810 P.2d 564, 566 (Alaska App.1991). However, the more clear and unambiguous the wording of the disputed statute, the correspondingly greater burden of persuasion borne by a litigant who contends that the statute does not mean what it appears to say. *University of Alaska v. Geistauts*, 666 P.2d 424, 428 n. 5 (Alaska 1983).

Ray relies on comments made by Representative Russ Meekins in January 1982 to the House Judiciary Committee, as that committee began its consideration of House Bill 438 (1981), the progenitor of AS 28.35.-035. Representative Meekins, the bill's original sponsor, told the committee that "the purpose of [the] bill is to allow the taking of blood samples ... in cases where the DWI has resulted in a motor vehicle accident causing physical injury or death *and the offender has refused to take the breathalyzer test.*" See Tape 4(1) of the proceedings of the House Judiciary Committee for January 21–22, 1982.

However, notwithstanding Rep. Meekins's comments, the language of HB 438 as proposed by him does not specify that a motorist's prior refusal of a breath test is a pre-condition of the police's authority to take a blood sample. Section 2 of Rep. Meekins's proposed bill (SS HB 438, introduced 4/4/81, the version referred to the House Judiciary Committee), would have amended AS 28.35.032(a) to read:

(a) If a person under arrest refuses the request of a law enforcement officer to submit to a chemical test of his breath as provided in AS 28.35.031 ..., a chemical test ~~may~~ ~~shall~~ not be given ~~except~~ ~~under (f) of this section.~~

At the same time, section 5 of the original bill would have created AS 28.35.032(f), which would have read:

(f) If a person is arrested for a crime alleged to have been committed by him while operating or driving a vehicle under the influence of intoxicating liquor and the crime is a homicide under AS 11.41.120(a)(1) or 11.41.130 or an assault under AS 11.41.210(a)(3) or 11.41.-230(a)(1) or (2), a chemical test of his blood may be administered without his consent if the taking of the blood sample occurs after or substantially contemporaneously with his arrest and in a manner which does not violate the constitutional rights of the accused.

(The "substantially contemporaneous" language apparently comes from *Layland v. State*, 535 P.2d 1043, 1046–48 (Alaska 1975), *overruled on other grounds*, *Geber*, 592 P.2d at 1191–92 & n. 8.)[2]

---

**2.** Section 7 of Rep. Meekins's original bill would also have enacted a new AS 28.35.035, allowing the police to take a blood test without the motorist's affirmative consent when either (1) the motorist was unconscious or otherwise incapable of refusing a breath test, or (2) the motorist,

The House Judiciary Committee's subsequent version of the bill (CS SSHB 438, offered March 8, 1982 and referred to the Finance Committee) contained language that, at least arguably, more nearly reflects a legislative intention to restrict blood tests to situations in which the motorist had first refused to submit to a breath test. Under the Judiciary Committee's version, AS 28.35.032(a) would have read:

(a) If a person under arrest refuses the request of a law enforcement officer to submit to a chemical test of his breath as provided in AS 28.35.031 ..., a chemical test may shall not be given in accordance with (i) of this section.

(CS SSHB 438, section 10), while a new AS 28.35.032(i) would have been enacted:

(i) If a person is arrested for a crime alleged to have been committed by him while operating or driving a motor vehicle while intoxicated, a chemical test of his blood may be administered without his consent.

(section 14). The Judiciary Committee's alteration of the concluding language of AS 28.35.032(a)—"a chemical test *may be given* in accordance with [new subsection] (i)"—may indicate that the Committee viewed the breath test refusal described in

subsection (a) to be a precondition of the blood test authorized in subsection (i).[3]

However, when the Judiciary Committee's CS SSHB 438 was referred to the House Finance Committee, the Finance Committee tabled the proposed legislation. Instead, the Finance Committee used the language of CS SSHB 438 as a foundation to rewrite another pending bill (Senate Bill 611), making it the vehicle for changes in the DWI statutes. The result was HCS SB 611 (Finance), offered April 21, 1982.

In the Finance Committee's version, all non-consensual chemical tests were removed from AS 28.35.032 and placed in a new AS 28.35.035. Section 17 of the Finance Committee's bill changed the language of AS 28.35.032(a) to:

(a) If a person under arrest refuses the request of a law enforcement officer to submit to a chemical test of his breath as provided in AS 28.35.031 ..., a chemical test shall not be given, except as provided by AS 28.35.035.

Section 21 of the Committee's bill proposed a new, comprehensive AS 28.35.035:

**Administration of chemical tests without consent.** (a) If a person is under arrest for the crime of driving while intoxicated and that arrest results from an accident that causes death or physical injury to another person, a chemical test

even though conscious and willing to submit to a breath test, was incapable of performing a breath test.

**Persons incapable of refusing or taking tests.** A person who is unconscious or otherwise in a condition rendering him incapable of refusing a chemical test of breath is considered not to have withdrawn the consent furnished under AS 28.35.031 if lawfully arrested for an offense arising out of acts alleged to have been committed while the person was operating a vehicle under the influence of intoxicating liquor, and a chemical test of the breath may be administered. A person who is in a condition rendering him incapable of being administered a chemical test of his breath may be administered a chemical test of his blood without his consent if lawfully arrested for an offense arising out of acts alleged to have been committed while the person was operating a vehicle under the influence of intoxicating liquor.

3. At the same time, the Committee (in section 19) narrowed Rep. Meekins's proposed AS 28.35.035, deleting the language which would have

authorized the police to draw a blood sample when the motorist, though wishing to submit to a breath test, was incapable of performing the breath test. The Committee narrowed AS 28.35.035 to include only situations in which the motorist was incapable of manifesting a refusal to submit to a breath test:

**Persons incapable of refusing or taking tests.** A person who is unconscious or otherwise in a condition rendering him incapable of refusing a chemical test of breath, if arrested for an offense arising out of acts alleged to have been committed while the person was operating or driving a motor vehicle while intoxicated, is nonetheless subject to a chemical test of his blood.

As a result of these three changes, the Judiciary Committee's version of the bill could be read as authorizing a non-consensual blood test only if (1) the motorist affirmatively refused a breath test, or if (2) the motorist was rendered incapable of manifesting refusal.

may be administered without the consent of the person arrested to determine the amount of alcohol in that person's breath or blood.

(b) A person who is unconscious or otherwise in a condition rendering him incapable of refusal is considered not to have withdrawn the consent provided under AS 28.35.031 and a chemical test may be administered to determine the amount of alcohol in that person's breath or blood.

(c) If a chemical test is administered to a person under (a) or (b) of this section, that person is not subject to the penalties for refusal to submit to a chemical test provided by AS 28.35.032 and 28.35.034.

The Finance Committee's bill was ultimately enacted (with no pertinent changes) as ch 117 SLA 1982.

Given this legislative history—and, in particular, the fact that the House Finance Committee tabled HB 438 and substituted its own rewritten version of SB 611—it is unclear how much weight should be given to Rep. Meekins's comments during the earlier hearings before the House Judiciary Committee.[4] Moreover, despite Rep. Meekins's comments to the Judiciary Committee, neither his version of the bill, nor the Judiciary Committee's revised version, nor the superseding version written by the Finance Committee and ultimately passed by the legislature contains an explicit statement that police authority to seek a blood test is conditioned on the motorist's prior refusal to submit to a breath test. As we noted above, the Judiciary Committee's version could conceivably be interpreted to impose such a condition, but that version was superseded by the Finance Committee's version.

In sum, Ray's arguments concerning the legislative history of AS 28.35.032(a) and AS 28.35.035(a) do not convince us that we should alter or augment the apparent meaning of those statutes. We can infer no legislative intent to limit the blood testing authorized in AS 28.35.035(a) to situations in which the motorist has first refused to submit to a breath test. See *State v. Judge*, 100 Wash.2d 706, 675 P.2d 219, 221–22 (1984), reaching the same interpretation of similar provisions found in RCW 46.20.308(1)–(5).

Ray argues that this interpretation of AS 28.35.035(a) is inconsistent with the policy of discouraging physical confrontations between motorists and police. Ray asserts that the legislature could not have wished to grant such broad authority to the police when, in many cases, the evidence sought by the police could just as easily be obtained by asking the motorist to submit to a breath test.

However, when an intoxicated driver injures or kills someone else, the driver's conduct will generally constitute a felony; society's interest in obtaining an accurate reading of the driver's blood alcohol level is commensurately greater than in a simple DWI situation. The legislature could reasonably conclude that, in cases involving injury or death, society's greater interest in obtaining timely and accurate evidence of the driver's level of intoxication outweighs the normal DWI policy of discouraging physical confrontation between police and motorists.

Accordingly, we reject the district court's construction of AS 28.35.035(a). We conclude that this statute authorizes the police to require a motorist to submit to a blood test even though there has been no prior attempt to obtain the motorist's consent to a breath test.

**4.** Ray also relies on contemporaneous comments by personnel of the Alaska Department of Law and the Municipality of Anchorage, indicating that they viewed the proposed law as allowing police to conduct a blood test after a breath test had been refused. Without some showing that these comments were presented to the legislature in a manner that could reasonably have influenced the legislature's deliberative process, we must disregard the comments. Ray additionally cites the testimony of a State Trooper captain to the Judiciary Committee, in which the captain refers to the problem faced by law enforcement agencies when an arrested driver refuses the breath test. But while this may have been one motivation for enacting AS 28.35.-035(a), the question presented in this appeal is whether it was the sole discernible intent of the statute.

*Constitutionality of AS 28.35.035(a)*

■ Ray next asserts that AS 28.35.-035(a) is unconstitutional if construed in this manner. He contends that the statute violates the due process clauses of the Fourteenth Amendment to the United States Constitution and Article I, Section 7 of the Alaska Constitution, the search and seizure provisions of the Fourth Amendment to the United States Constitution and Article I, Section 14 of the Alaska Constitution, and the privacy provision of the Alaska Constitution, Article I, Section 22.

■ To a great extent, Ray's due process claim overlaps his search and seizure claim. The due process guarantee protects citizens from the arbitrary or fundamentally unfair use of government power[5], while the search and seizure clause requires that the government engage only in reasonable searches and seizures. Obviously, a government intrusion that violates the due process guarantee (because it is arbitrary or inconsistent with fundamental notions of justice) will also violate the search and seizure clause (because it will be unreasonable). The reverse, however, is not always true. Thus, in Ray's case the search and seizure clause is likely to provide the broader protection.

Ray's basic argument is that the government must employ the least intrusive method capable of testing the motorist's blood alcohol level. Ray contends that a blood test is significantly more intrusive than a breath test, and therefore the government cannot avail itself of blood testing unless and until the motorist has affirmatively refused to submit to a breath test.

However, the United States Supreme Court rejected similar due process challenges to blood testing in *Breithaupt v. Abram,* 352 U.S. 432, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957), and *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). When the blood sample is drawn "by a physician in a simple, medically acceptable manner in a hospital environment", blood extraction from an arrestee is not so great an intrusion as to violate due process. *Schmerber,* 384 U.S. at 759–760, 86 S.Ct. at 1830. *See also Winston v. Lee,* 470 U.S. 753, 762; 105 S.Ct. 1611, 1617; 84 L.Ed.2d 662 (1985): "*Schmerber* recognized society's judgment that blood tests do not constitute an unduly extensive imposition on an individual's personal privacy and bodily integrity." All doubt on this point was laid to rest in *South Dakota v. Neville,* 459 U.S. 553, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983), where the Supreme Court reaffirmed that a state may "force a person suspected of driving while intoxicated to submit to a blood-alcohol test", and that any right of the motorist to refuse a blood test was a matter of legislative grace. 459 U.S. at 559–560, 103 S.Ct. at 920.

Ray points out that the Supreme Court apparently conditioned its due process ruling in footnote 4 of *Schmerber:* "It would be a different case if the police ... refused to respect a reasonable request to undergo a different form of testing[.]" 384 U.S. at 760, 86 S.Ct. at 1830. Ray reads this footnote as an indication that the police are constitutionally limited to the least intrusive reasonable test available. However, we do not interpret this footnote so broadly.

First, the footnote itself suggests only that the police should respect a motorist's

---

**5.** [The due process clauses of the Fifth and Fourteenth Amendments] have their historical origins in the notion that conditions of personal freedom can be preserved only when there is some institutional check on arbitrary government action. The Supreme Court has analogized due process to the Magna Carta's "guaranties against the oppressions and usurpations" of the royal prerogative.

Laurence Tribe, *American Constitutional Law* (2nd ed. 1988), § 10–7, p. 664, quoting *Hurtado v. California,* 110 U.S. 516, 531; 4 S.Ct. 111, 119, 28 L.Ed. 232 (1884). *Hurtado* continues:

Law is something more than mere will exerted as an act of power. ... Arbitrary power, enforcing its edicts to the injury of the persons and property of its subjects, is not law, whether manifested as the decree of a personal monarch or of an impersonal multitude. ... [T]he limitations imposed by our constitutional law upon the action of the governments, both state and national, are essential to the preservation of public and private rights, notwithstanding the representative character of our political institutions. 110 U.S. at 536, 4 S.Ct. at 121.

affirmative request for a reasonable alternative test, not that the police are obliged to offer alternative tests in the absence of any request. Compare *Svedlund v. Anchorage*, 671 P.2d 378, 382 (Alaska App. 1983), in which this court held that, while police officers must honor an arrested motorist's affirmative request to speak to counsel before taking a breath test, the officers have no affirmative duty to inform the motorist of the right to counsel.

Second, despite the language of footnote 4, when the Supreme Court returned to the issue of a motorist's request for an alternative test later in its opinion, the court concluded that it did not have to reach the issue:

> [Blood] tests are a commonplace in these days of periodic physical examinations[,] and experience with them teaches that the quantity of blood extracted is minimal, and that for most people the procedure involves virtually no risk, trauma, or pain. Petitioner is not one of the few who on grounds of fear, concern for health, or religious scruple might prefer some other means of testing, such as [a breath test]. We need not decide whether such wishes would have to be respected.

*Schmerber*, 384 U.S. at 771, 86 S.Ct. at 1836.

Ray cites *People v. Fiscalini*, 228 Cal. App.3d 1639, 279 Cal.Rptr. 682 (1991), as a case that provides the answer to *Schmerber's* unanswered question. In *Fiscalini*, the arresting officer initially offered the motorist a choice of a breath, blood, or urine test. The motorist decided to give a urine specimen. However, after this was done, the officer decided that a blood test would yield a more accurate measure of the motorist's blood alcohol level, so he insisted that the motorist submit to a blood test too. The motorist refused, and the police forcibly extracted the blood sample. 279 Cal.Rptr. at 683.

*Fiscalini* does not support Ray's due process argument. The California court acknowledged that, under *Schmerber*, even a forcible extraction of an arrested motorist's blood would not violate the due pro-

cess clause. The court held that the seizure of Fiscalini's blood had been illegal because the police had failed to satisfy the exigency requirement imposed by *Schmerber* and *Winston*. Fiscalini had already submitted a urine sample, so the police had had no immediate need to obtain a blood sample. *Id.* at 685.

Ray characterizes *Fiscalini* as standing for the proposition that the police must always use the least intrusive method of obtaining blood-alcohol evidence, but the *Fiscalini* court was not called upon to decide this issue. The motorist in *Fiscalini* had, at the request of the police, already given a urine sample before the police mentioned the additional blood test. On those facts, the court could reasonably conclude that the police had failed to demonstrate the need to take the motorist's blood. *Id.* at 685. *Fiscalini* does not address Ray's claim that the federal constitution forbids the police from obtaining a sample of an arrested motorist's blood unless they have unsuccessfully sought to obtain the motorist's consent to a breath test.

■ We agree with the Supreme Court's decisions in *Breithaupt*, *Schmerber*, and *Neville* that a state legislature may constitutionally leave the choice of chemical test to the arresting officer—that due process does not require the police to begin with the least intrusive available method (that is, a breath test rather than a blood test). *Accord, Kostyk v. Commonwealth*, 131 Pa. Cmwlth. 455, 570 A.2d 644, 646–48 (1990).

■ Turning to Ray's search and seizure argument, Ray's claim that a blood test is an unreasonable seizure has been addressed by both the United States Supreme Court and the appellate courts of this state. In *Schmerber*, the United States Supreme Court rejected the government's contention that a blood sample from an arrested motorist could be viewed as simply another type of search incident to arrest. 384 U.S. at 769–770, 86 S.Ct. at 1835. However, the court upheld the taking of blood under the exigent circumstances exception to the warrant requirement, since blood alcohol generally begins to dissipate shortly after a person stops

drinking. 384 U.S. at 770–71, 86 S.Ct. at 1835–36.

In *Layland v. State*, 535 P.2d at 1045–49, the Alaska Supreme Court indicated its approval of the *Schmerber* result, construing Alaska's search and seizure clause, Article I, Section 14, to allow blood tests over a motorist's protest, provided that the motorist had been lawfully arrested.

Nevertheless, Ray argues, if police authority to draw blood from an arrested motorist stems from a combination of the "search incident to arrest" and "exigent circumstances" doctrines, then the police, to prove exigency, must show a true need to conduct a blood test as opposed to a breath test. Ray relies on language from *Reeves v. State*, 599 P.2d 727, 735 (Alaska 1979), where the supreme court, speaking generally of the recognized exceptions to the warrant requirement, stated that "a search conducted pursuant to such an exception must be no broader or more intrusive than necessary to fairly effect the government purpose which serves as its justification."

■ This language from *Reeves*, while it is addressed to warrantless searches, applies equally to searches authorized by warrant: no governmental intrusion on the privacy of citizens should be broader or more intrusive than necessary to accomplish the government purpose that justifies it. Ray's argument does not turn on this legal principle, but rather on his assertion that a blood test is, for constitutional purposes, a materially different type of seizure from a breath test. This assertion is at odds with our prior cases.

In *Gundersen v. Anchorage*, 762 P.2d 104, 112 (Alaska App.1988), *aff'd*, 792 P.2d 673, 678 (Alaska 1990), and in *Swanson v. Juneau*, 784 P.2d 678, 679 (Alaska App. 1989), this court held that it was reasonable for the police to offer a blood test (as opposed to a second breath sample) to an arrested motorist to fulfill the government's due process obligation to provide the motorist a means of independently verifying breath test results. "[W]e [cannot] say that the drawing of blood is so intrusive a procedure as to be an unreasonable

alternative *per se.*" *Gundersen*, 762 P.2d at 112. See also *Srala v. Anchorage*, 765 P.2d 103, 105 (Alaska App.1988), where this court declared that an arrestee has no Fourth Amendment right to refuse either a breath or a blood test.

■ These cases indicate that, for due process and search and seizure analysis, a blood test is not viewed as materially more intrusive than a breath test. Moreover, even if we were to view a blood test as materially more intrusive, the question remains whether it is a reasonable intrusion under the circumstances. As we discussed before, society's interest in obtaining a timely and accurate measure of a motorist's blood alcohol level is much greater in cases where the motorist has injured or killed another person. We therefore conclude that the search and seizure provisions of the federal and state constitutions are not offended by a statute that allows the police to take a blood sample from an arrested motorist in such cases without seeking a breath sample first. The legislature may, as a matter of policy, order one test given in preference to the other. AS 28.35.032(a) establishes a preference for the breath test in non-injury drunk driving arrests, but AS 28.35.035(a) does not mandate the same preference when an intoxicated driver has caused injury or death.

■ Ray's final constitutional challenge to AS 28.35.035(a) is that it violates his right to privacy under Article I, Section 22 of the Alaska Constitution. However, the right to privacy granted by Article I, Section 22 does not create a separate, independent right to seek exclusion of evidence:

[A] review of Alaska Supreme Court decisions reflects no intent to create an independent ground of exclusion. *See, e.g., State v. Glass*, 583 P.2d 872 (Alaska 1978). A close reading of the cases establishes that suppression is always predicated on [the search and seizure provisions of] art. 1, § 14, and that § 22 is merely used as a justification for giving § 14 a liberal interpretation.

*Wortham v. State*, 641 P.2d 223, 224–25 n. 2 (Alaska App.1982), *aff'd*, 666 P.2d 1042 (Alaska 1983). *See also Schultz v. State*, 593 P.2d 640, 642 (Alaska 1979), and *Bargas v. State*, 489 P.2d 130, 132 (Alaska 1971). Thus, our ruling that AS 28.35.-035(a) does not violate the search and seizure clause of the Alaska constitution disposes of Ray's privacy challenge as well.[6]

*Conclusion*

For the reasons explained above, we conclude that AS 28.35.035(a) authorizes the police to test the blood of a motorist who has been arrested for an offense arising from an act of intoxicated driving that has caused death or injury to another person, regardless of whether the motorist has been offered a breath test first. We additionally conclude that this statute does not violate the due process, search and seizure, or privacy clauses of either the federal or state constitution. The decision of the district court is REVERSED, and this case is remanded to that court for further proceedings on the criminal complaint.

---

**6.** Ray also argues that, even if the warrantless seizure of his blood is constitutional, the police conducted an unconstitutional warrantless search when they tested the blood. This issue was not raised in the district court; we therefore do not consider it.